UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| KUSH ENTERPRISES, LLC, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | No. 3:18-CV-492 |
| | ) | |
| MASSACHUSETTS BAY | ) | |
| INSURANCE COMPANY, | ) | |
| | ) | |
| *Defendant.* | ) | |

# **M E M O R A N D U M**

Before the Court is Defendant Massachusetts Bay Insurance Company's motion to exclude the testimony of two expert witnesses for Plaintiff Kush Enterprises, LLC, under Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). (Doc. 64.) Plaintiff has responded in opposition. (Doc. 73.) Defendant did not file a reply, and the time to do so has expired. *See* E.D. Tenn. L.R. 7.1(a).

A *Daubert* hearing on this motion is scheduled for August 11, 2021. (Doc. 84.) "Under normal circumstances, a district court may resolve a *Daubert* motion without holding a hearing." *Adler v. Elk Glenn, LLC*, 986 F. Supp. 2d 851, 854 (E.D. Ky. 2013) (citing *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 249 (6th Cir. 2001)). "A hearing is required only if the record is inadequate to decide the motion," *id.*, but not "where 'the record on the expert testimony [is] extensive, and the *Daubert* issue [is] fully briefed.'" *United States v. Cunningham*, 679 F.3d 355, 381 (6th Cir. 2012) (quoting *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 532 (6th Cir. 2008)).

The parties have fully briefed the admissibility of the challenged experts' testimony, and the Court concludes a *Daubert* hearing is unnecessary. Accordingly, the August 11, 2021, *Daubert* hearing will be **CANCELED**.

For the reasons explained below, the Court will **DENY** Defendant's motion to exclude the expert testimony of Mr. Irmiter and Mr. Howarth (Doc. 64).

**I.     BACKGROUND**

This case involves an insurance-coverage dispute arising from the November 2016 wildfires in Gatlinburg, Tennessee. Plaintiff owns a motel and apartments in Gatlinburg (hereinafter, the "Properties"), which sustained damage as a result of the wildfire.

**A.     Plaintiff's Insurance Policy & Coverage Dispute**

Plaintiff's insurance policy covers direct physical loss of or damage to covered property caused by or resulting from any covered cause of loss. The policy provides replacement-cost coverage, which is defined as the cost to restore the property to pre-loss condition.

After the wildfire, on December 5, 2016, Plaintiff filed its insurance claim with Defendant. Following some assessments of the Properties, Defendant paid Plaintiff $165,676.39 for the damage. However, in December 2017, Plaintiff invoked the appraisal provision of its insurance policy[1] and hired The Howarth Group and Mr. Charles Howarth to evaluate the amount of loss.

---

[1] The appraisal provision reads:

> If we and you disagree on the amount of net income, operating expense or loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the amount of the net income, operating expense and loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

On September 4, 2018, Mr. Howarth sent Defendant an estimated repair proposal for $2,436,816.49 based, at least in part, on a report from Mr. Thomas Irmiter of Forensic Building Sciences. On September 10, 2018, Plaintiff submitted to Defendant a proof of loss for actual cash value of $2,120,030.035.

### B. Lawsuit & Court-Ordered Appraisal

On November 20, 2018, Plaintiff filed this lawsuit against Defendant, alleging breach of contract and seeking to compel appraisal. (Doc. 1.) The Court ordered the parties to participate in the appraisal process (Doc. 32), which resulted in an appraisal award of $1,896,937.36 for replacement-cost value and $1,644,106.58 actual cash value (Doc. 42-1). Defendant contests this award, disputing not only the scope of the covered loss, but also the total amount of loss. (*See* Doc. 45.)

### C. Plaintiff's Expert Disclosures

Plaintiff has disclosed two expert witnesses, Mr. Irmiter and Mr. Howarth. (Docs. 56, 73-3, 73-6.)

#### 1. Thomas Irmiter (Forensic Building Sciences)

Plaintiff has retained Mr. Irmiter to provide expert opinions "regarding the scope of loss and required scope of repairs" at Plaintiff's Properties. (Doc. 73-3 at 1.)

Mr. Irmiter has over forty-five years of experience in the "construction, restoration, and

---

      a. Pay its chosen appraiser; and
      b. Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

(Doc. 1-1 at 28.)

3

building inspection industry" and has been a certified building code official in Minnesota since 2006. (Doc. 73-1 ¶ 2.) Throughout his forty-five years of experience, Mr. Irmiter has "conducted over 10,000 failure analyses and evaluated over 5,000 structures involving damage to commercial properties," some of which were related to fire damage and loss. (*Id.* ¶ 5.) In doing so, Mr. Irmiter has had to design and conduct particulate sampling for mold, chemicals, asbestos, and soot, among other particles, following the standards set forth by the American Industrial Hygienist Association and requirements of the American Standards and Testing Measures. (*Id.* ¶¶ 7, 9.) In addition, he prepares scope-of-work and repair estimates for buildings. (*Id.* ¶ 5.)

Mr. Irmiter also has performed expert work for over thirty-five years. (*Id.* ¶ 2.) He has been qualified in other cases to offer expert opinions "concerning the proper methods of restoration, remediation, and/or repair of a property." (*Id.* ¶ 6.) Further, Mr. Irmiter has authored between eighty and eighty-five reports in wildfire debris cases. (Doc. 64-3 at 5.)

After Plaintiff retained Mr. Irmiter, he inspected the Properties at least two times. (Doc. 73-1 ¶ 10.) He then used his background and experience to develop a sampling methodology to evaluate the movement of smoke, if any, into the Properties. (*Id.* ¶ 10(a)–(b).) Personnel from Forensic Building Sciences then conducted soot sampling, following the American Standards and Testing Measures, (*id.* ¶¶ 11, 12), and these samples were then tested by a third party (*id.* ¶ 15). The third-party testing revealed the presence of residual char and soot in the Properties. (*Id.*)

Drawing on his experience and knowledge, Mr. Irmiter reviewed the sampling results and concluded that the fire particulate present in the Properties' roof, wall, floor, and ceiling needed to be removed. (*Id.* ¶ 16.) Mr. Irmiter then consulted the International Building Code, International Energy Conservation Code, and local amendments, to determine the necessary repairs to return the Properties to their pre-loss condition. (*Id.* ¶ 17.) Mr. Irmiter recommended the following the

following actions to repair the Properties:

1) Remove all attic insulation to access framing for cleaning.
2) Remove one side of all gypsum enclosed interior partition walls to access cavities for cleaning.
3) Remove all gypsum covered CMU block walls to access the cavities for cleaning.
4) Remove any wall finish and insulation from interior side of exterior wall.
5) All carpeting should be deep cleaned/shampooed.
6) Remove and replace all flex ducting. Open remaining ducting to access for cleaning.
7) HEPA vac all exposed framing and ducting.
8) Seal all exposed wood framing with alcohol-based sealer BIN.
9) Test ambient air prior to installation of new materials.
10) Replace all insulation to code.
11) Replace all interior wall and floor finishes.
12) Reinstall all detached cabinets, bath fixtures and appliances after cleaning.
13) Remove and replace any remaining damaged interior materials.
14) Licensed Electrician should inspect and evaluate the electrical wiring in the building to determine if repairs or modifications will be needed where all electrical boxes and/or conduit may have soot inside of them.
15) Alternate construction techniques may be acceptable provided a licensed design professional approves and signs and stamps plans and or shop drawings for these repairs. Means and methods are the Contractor's responsibility.
16) Conform with any special inspection and testing schedules if issued by an engineer.
17) Contractor is solely responsible for adherence to all applicable safety requirements for work at heights.
18) Stability during construction is the responsibility of the Contractor.

(Doc. 73-3 at 33–34.) Later on, Mr. Irmiter confirmed that these recommended repairs were in accordance with the Restoration Industry Association Guidelines. (Doc. 73-1 ¶ 20.)

### 2. Charles Howarth (The Howarth Group)

Plaintiff also has retained Mr. Howarth as an expert regarding the scope of damage, appropriate remediation measures, and the cost of repairs. (Doc. 73-6.) Mr. Howarth has forty years of experience in the property claims adjusting business. (Doc. 73-5 ¶ 3.) He has adjusted over 10,000 property-damage claims and participated in 3,000 property-damage appraisals as an

5

appraiser or umpire, and at least 3,000 of these claims and appraisals have involved fire damage and loss. (*Id.* ¶ 6.) Mr. Howarth has been qualified in other cases to offer expert opinions "concerning proper methods of restoration, remediation, and/or repair of property due to fire damage, as well as the cost of the same, in seven cases." (*Id.* ¶ 7.)

Mr. Howarth calculated the repair costs and estimates for Plaintiff's Properties using a claims-estimating program called Xactimate. (*See id.* ¶¶ 5, 12.) To do so, Mr. Howarth considered Mr. Irmiter's findings, as well as other reports, and drew from his experience and relevant industry standards. (*Id.* ¶¶ 12, 18.)

Defendant now moves to exclude the proffered expert opinions of both Mr. Irmiter and Mr. Howarth. (Doc. 64.)

## II. <u>LEGAL STANDARD</u>

Rule 702 of the Federal Rules of Evidence provides the standard for admission of expert testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Rule 702 reflects decisions by the United States Supreme Court in *Daubert*, 509 U.S. 579, and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999), which establish district courts' role as gatekeepers to exclude unreliable expert testimony. *See Scrap Metal*, 527

6

F.3d at 528 (discussing *Daubert* and *Kumho*). The Court does not decide whether an opinion is correct, but only whether it rests on a reliable foundation. *Id.* at 529–30.

The Court of Appeals for the Sixth Circuit has identified three requirements under Rule 702: (1) the proposed expert must have the requisite qualifications, whether it be through knowledge, skill, experience, training, or education; (2) the proposed testimony must be relevant, that is, it will help the trier of fact to understand the evidence or to determine a fact in issue; and (3) the proposed testimony must be reliable. *Id.* at 529. A non-exclusive list of factors to consider in assessing reliability includes "testing, peer review, publication, error rates, the existence and maintenance of standards controlling the technique's operation, and general acceptance in the relevant scientific community." *Id.* (quoting *United States v. Langan*, 263 F.3d 613, 621 (6th Cir. 2001)). These factors do not apply in every case; they should be tailored to the case as necessary and should only be applied "where they are reasonable measures of the reliability of expert testimony." *Id.* (quoting *Gross v. Comm'r*, 272 F.3d 333, 339 (6th Cir. 2001)).

"It is the proponent of the testimony that must establish its admissibility by a preponderance of proof." *Nelson*, 243 F.3d at 251 (citing *Daubert*, 509 U.S. at 592 n.10).

## III.     ANALYSIS

Defendant seeks to exclude the proffered expert opinions of Mr. Irmiter and Mr. Howarth. (Doc. 64.) Defendant's argument to exclude Mr. Howarth's testimony relies, in part, on the argument to exclude Mr. Irmiter's testimony, so the Court turns first to Mr. Irmiter.

### A.     Thomas Irmiter (Forensic Building Science)

Defendant moves to exclude Mr. Irmiter's proffered expert testimony on two grounds under Rule 702. (Doc. 64 at 7–12.) First, Defendant asserts Mr. Irmiter is not qualified to testify as an expert in the areas in which Plaintiff offers his testimony. (*Id.* at 9–10.) Second, Defendant

7

argues Mr. Irmiter's opinion is unreliable, as he failed to disclose the methodology from which he formed his opinion. (*Id.* at 10–12.) Each ground is addressed in turn.

### 1. Qualifications

To determine whether Mr. Irmiter's qualifications meet Rule 702, the Court first must evaluate "the purpose for which the testimony is offered." *See Meemic Ins. Co. v. Hewlett-Packard Co.*, 717 F. Supp. 2d 752, 762 (E.D. Mich. 2010). "The issue with regard to expert testimony is not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." *Rose v. Truck Ctrs., Inc.*, 388 F. App'x 528, 533 (6th Cir. 2010) (quoting *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994)). Stated differently, Mr. Irmiter's "qualifications must be relevant to the opinion sought." *See Zuzula v. ABB Power T & D Co., Inc.*, 267 F. Supp. 2d 703, 713 (E.D. Mich. 2003).

Plaintiff offers Mr. Irmiter's expert opinion on two issues: (1) the scope of loss to the Properties and (2) the required scope of repair to the Properties. (Doc. 73-1 at 1.) Accordingly, Mr. Irmiter must be qualified to provide expert opinions as to those two issues.

Defendant argues Mr. Irmiter is not qualified due to his lack of education, training, or experience in toxicology, chemistry, or medicine, such that he cannot offer an expert opinion "regarding the carcinogenic properties of debris." (Doc. 64 at 7, 9–10.) Defendant notes that Mr. Irmiter does not have a degree in engineering, toxicology, chemistry, or medicine. (*Id.* at 7–8.) Plaintiff responds that Mr. Irmiter is qualified to offer expert testimony as to fire remediation methods based on his knowledge, experience, training, and expertise. (Doc. 73 at 2, 7–9.)

Defendant's argument is without merit for two reasons. First, Mr. Irmiter's proffered expert testimony does not include expert opinions as to toxicology, chemistry, medicine, or engingeering. Indeed, toxicology, chemistry, medicine, and engineering may underlie Mr.

8

Irmiter's expert opinions insofar as those disciplines may inform the industry standards on which Mr. Irmiter relied and with which Mr. Irmiter says he has complied. But that does not mean Mr. Irmiter must be an expert in such areas. *See Zuzula*, 267 F. Supp. 2d at 713 (E.D. Mich. 2003) (quoting *Mannino v. Int'l Mfg. Co.*, 650 F.2d 846, 850 (6th Cir. 1981)) (stating "the expert need not have complete knowledge about the field in question").

The Court of Appeals for the Sixth Circuit has explained how scientific and non-scientific expert testimony both may be appropriate under Rule 702 depending on the purpose for which the expert's opinion is offered. *See Berry*, 25 F.3d at 1349–50.

> The distinction between scientific and non-scientific expert testimony is a critical one. By way of illustration, if one wanted to explain to a jury how a bumblebee is able to fly, an aeronautical engineer might be a helpful witness. Since flight principles have some universality, the expert could apply general principles to the case of the bumblebee. Conceivably, even if he had never seen a bumblebee, he still would be qualified to testify, as long as he was familiar with its component parts.
>
> On the other hand, if one wanted to prove that bumblebees always take off in the wind, a beekeeper with no scientific training at all would be an acceptable expert witness *if* a proper foundation were laid for his conclusions. The foundation would not relate to his formal training, but to his firsthand observations. In other words, the beekeeper does not know any more about flight principle than the jurors, but he has seen a lot more bumblebees than they have.

*Id.*

In this case, Mr. Irmiter's testimony is like that of the beekeeper. He may not know any more about toxicology, chemistry, or medicine than the jurors, but he has firsthand observations and experience in evaluating scope of loss and required repairs based on such loss to buildings. In fact, expert opinions as to toxicology, chemistry, and medicine likely would be irrelevant and distract the jury, as they have nothing to do with the scope of Plaintiff's insurance coverage. Thus, considering the purpose of Mr. Irmiter's proffered expert opinions, the Court rejects Defendant's

9

arguments regarding his qualifications in the areas of toxicology, chemistry, medicine, and engineering.

Second, having a degree or diploma "is neither a necessary nor a sufficient condition for qualification as an expert because the expert's education must be relevant to the opinion, and qualification may be based on knowledge, skill, training, experience or training as well." *Zuzula*, 267 F. Supp. 2d at 713. The principle of *Daubert* "is to make certain that an expert, whether basing testimony upon professional studies *or personal experience*, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho*, 526 U.S. at 152 (emphasis added). "It is well established that experience-based testimony satisfies Rule 702 admissibility requirements." *In re E.I. du Pont de Nemours & Co. C-8 Personal Inj. Litig.*, 345 F. Supp. 3d 897, 902 (S.D. Ohio 2015).

Mr. Irmiter's experience satisfies Rule 702's qualifications requirement. He has over forty-five years of experience in the construction, restoration, building-inspection, and remediation industries. *See, e.g.*, *Bradley v. Ameristep, Inc.*, 800 F.3d 205, 209 (6th Cir. 2015) (holding district court abused discretion in deeming product-defect expert was not qualified based on "over thirty-five years of experience" conducting similar failure analyses); *Rose*, 388 F. App'x at 534 (finding proffered expert's "experiences as a mechanic give him specialized knowledge in the areas of truck mechanics and steering gears"). He has evaluated the damage sustained to thousands of commercial properties, including many arising from fire loss. He has prepared scope-of-work and repair estimates for buildings. Mr. Irmiter also has authored numerous reports for wildfire debris cases and been qualified in other cases as an expert in methods of restoration, remediation, and repair of property. *See, e.g.*, *United States v. Thomas*, 74 F.3d 676, 681 n.3 (6th Cir. 1996) (explaining a police officer was qualified to testify as an expert about drug trafficking, in part,

10

because he had testified on the subject "numerous times"); *United States v. Felix*, No. 1:17-CR-009, 2019 WL 2744621, at *3 (S.D. Ohio July 1, 2019) (considering whether proffered expert "has previously qualified as an expert" to decide *Daubert* motion).[2]

Mr. Irmiter's significant experience, which has contributed to his knowledge and skill, make his knowledge specialized and beyond the scope of an ordinary juror. *See Zuzula*, 267 F. Supp. 2d at 713. The Court therefore finds Mr. Irmiter is qualified under Rule 702 and *Daubert* to offer expert opinions regarding the scope of loss and the required scope of repairs to the Properties.

### 2. Reliability

Defendant also moves to exclude Mr. Irmiter's proffered expert testimony based on reliability, specifically, that he did not use a reliable, or even identifiable, method to reach his opinions. (Doc. 64 at 10.) Plaintiff responds that Mr. Irmiter formed his expert opinion using reliable methods, such as the American Standards and Testing Measures. (Doc. 73 at 2, 9–13.)

"The task for the district court in deciding whether an expert's opinion is reliable is not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation." *Scrap Metal*, 527 F.3d at 529–30. "[T]he relevant reliability concerns may focus upon personal knowledge or experience." *Kumho*, 526 U.S. at 150; *see also Thompson v. State Farm Fire & Cas. Co.*, 548 F. Supp. 2d 588, 590–91 (W.D. Tenn. 2008).

---

[2] *See also United States v. Hassan*, 742 F.3d 104, 131 (4th Cir. 2019) (finding a trial court did not err in qualifying a terrorism expert who previously qualified to testify on terrorism matters); *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004) (holding a district court did not abuse its discretion in qualifying an insurance expert who testified on similar issues in twelve previous cases and had never been found unqualified).

Plaintiff has demonstrated Mr. Irmiter's expert opinions are reliable. Specifically, his methodology is reliable, as it is based on his knowledge and experience in scope-of-loss and repair determinations, as well as his experience in fire-loss inspections and failure analyses. To begin, Mr. Irmiter personally inspected the Properties. (Doc. 73-1 ¶ 10.) After doing so, he developed a sampling methodology, in compliance with the American Standards and Testing Measures and in accordance with his prior experience. (*Id.* ¶¶ 10–12.) Forensic Building Science personnel then collected the samples and sent them for analysis. (*Id.* ¶¶ 11–12, 15.) Mr. Irmiter reviewed the sampling analysis and determined the repairs required to bring the Properties to pre-loss condition by referencing the International Building Code,[3] International Energy Conservation Code, and relevant local amendments. (*Id.* ¶¶ 16; Doc. 73-3 at 33–34.)

Defendant is correct that Mr. Irmiter's methodology is not necessarily scientific. But it need not be. Instead, his methodology was based on his prior experience, which satisfies Rule 702 and *Daubert*. *See, e.g.*, *Travelers Cas. Ins. Co. of Am. v. Volunteers of Am. Ky., Inc.*, No. 5:10-301-KKC, 2012 WL 3610250, at *7 (E.D. Ky. Aug. 21, 2012). "Any weaknesses in his methodology will affect the weight that his opinion is given at trial, but not its threshold admissibility." *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 182 (6th Cir. 2009).

Defendant contends Mr. Irmiter's methodology is unreliable because it fails to satisfy any of the *Daubert* reliability factors. (Doc. 64 at 10.) But it does not need to, because those factors do not apply in every case. *See Scrap Metal*, 527 F.3d at 529. Thus, "the fact that [an expert's]

---

[3] *See Nelson v. Costco Wholesale Corp.*, No. 3:18-cv-278-BJB-RSE, 2021 WL 2459472, at *5 (W.D. Ky. June 16, 2021) (excluding expert report that failed to "identify the 'generally accepted' safety practices or any relevant provisions of the . . . International Building Code"); *Metromont Corp. v. Allan Myers, L.P.*, No. DKC 18-3928, 2021 WL 1733474, at *3 (D. Md. May 3, 2021) (explaining the International Building Code "may be [a] reliable base[] for the formation of . . . expert opinions . . . because [it is] informative of the industry-wide standards of care").

opinions may not have been subjected to the crucible of peer review, or that their validity has not been confirmed through empirical analysis, does not render them unreliable and inadmissible." *First Tenn. Bank Nat'l Ass'n v. Barreto*, 268 F.3d 319, 334 (6th Cir. 2001); *Blevins v. Kirk*, No. 18-5369, 2019 WL 5151310, at *3 (6th Cir. May 22, 2019) ("[E]ven expert opinions that do not necessarily lend themselves to scientific testing and peer review may otherwise be admissible, such as where the expert has extensive practical experience in a field."). "[T]he *Daubert* reliability factors [therefore are] unhelpful in the present case." *Barreto*, 268 F.3d at 335. Mr. Irmiter's expert testimony is derived largely from his practical experiences throughout forty-five years in the construction, restoration, building-inspection, and remediation industries, and "[o]pinions formed in such a manner do not easily lend themselves to scholarly review or to traditional scientific evaluation." *See id.*

Mr. Irmiter reached his expert opinions based on his experience, knowledge, and skill, as well as by reference to relevant industry standards, so the Court finds his methodology reliable under Rule 702 and *Daubert*.

In conclusion, the Court will **DENY** Defendant's motion (Doc. 64) as to Mr. Irmiter's proffered expert opinions on the scope of the loss and the required scope of repairs to the Properties.

### B.     Charles Howarth (The Howarth Group)

Defendant moves to exclude the expert testimony of Mr. Howarth based on both Rule 702 and Rule 403 of the Federal Rules of Evidence. (Doc. 64 at 4, 12–13.) Each basis for exclusion is addressed in turn.

### 1. Rule 702

Defendant asserts Mr. Howarth's opinion fails to satisfy Rule 702 and *Daubert* as it "relied entirely" on Mr. Irmiter's report which, as discussed above, Defendant contends is unreliable. (Doc. 64 at 12–13.) Plaintiff responds that Mr. Howarth's expert opinions are based on his independent knowledge and experience in claims adjustment and were reached using Xactimate, a reliable program. (Doc. 73 at 2, 14–18.) Plaintiff also asserts any merit to Defendant's arguments goes toward Mr. Howarth's credibility, not the admissibility of his testimony. (*Id.* at 2, 18–19.)

The Court finds Mr. Howarth's reliance on Mr. Irmiter's report to be permissible for two reasons. First, Defendant is incorrect in asserting Mr. Howarth relied exclusively on Mr. Irmiter's report to reach his expert opinions. Rather, Mr. Howarth "formulat[ed] [an] independent remediation plan, based on industry standards, to return [the Properties] to pre-loss condition" and estimated the associated costs. (*See* Doc. 73-5 ¶¶ 17–18.) To estimate the costs, Mr. Howarth used Xactimate, a program that other courts have found reliable under Rule 702.[4]

Second, contrary to Defendant's contention, Mr. Irmiter's expert opinions are reliable, *see supra* III.A, and "an expert may in some circumstances rely on other experts' testimony." *See Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 675 (6th Cir. 2010). Such reliance is appropriate "[i]f

---

[4] *See, e.g.*, *Shadow Lake Mgmt. Co. v. Landmark Am. Ins. Co.*, No. 06-4357, 2008 WL 2510121, at *4 (E.D. La. June 17, 2008) ("Because [the expert]… used Xactimate, a program commonly used in the insurance industry, his opinions are sufficiently reliable. Indeed, the Xactimate methodology is reliable under Daubert because inputting the same data into the analysis would reliably result in the same output."); *Denley v. Hartford Ins. Co.*, No. 07-4015, 2008 WL 2951926, at *4 (E.D. La. July 28, 2008) (internal citation omitted) ("Manale and Wirth's methodology for determining damage was using the Xactimate tool, which Wirth is certified to use. This tool is widely recognized and used in the insurance industry to estimate damage…. Using the Xactimate as an estimate tool, this methodology meets the soundness criteria.").

experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject." Fed. R. Evid. 703; *see also United States v. Roberts*, 830 F. Supp. 2d 372, 383 (M.D. Tenn. 2011) ("[E]xperts may rely on data from others, at least to the extent that the data is of the type reasonably relied on by other experts in the field."). An expert as to cost of repairs would reasonably rely on a report assessing the scope of loss and necessary repairs.

Thus, Mr. Howarth's expert testimony is admissible under Rule 702 and *Daubert*.

### 2. Rule 403

"As with all evidence, relevant expert testimony may be excluded pursuant to Rule 403 of the Federal Rules of Evidence." *United States v. Gallion*, 257 F.R.D. 141, 153 (E.D. Ky. 2009). Rule 403 allows a court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, [or] misleading the jury . . . ." Fed. R. Evid. 403. "District courts are given broad discretion in making a Rule 403 determination." *United States v. Bonds*, 12 F.3d 540, 567 (6th Cir. 1993).

Defendant argues Mr. Howarth's expert testimony should be excluded under Rule 403, as its probative value is substantially outweighed by unfair prejudice to Defendant and a likelihood of confusing the jury. (Doc. 64 at 13.) Specifically, Defendant contends Plaintiff cannot "establish[] a causal link between any soot in the interstitial spaces and adverse health effects from that soot" and therefore Mr. Howarth's expert opinion will be prejudicial and confusing to the jury. (*Id.*) Plaintiff does not specifically respond to this argument. (*See* Doc. 73.)

The Court finds exclusion of Mr. Howarth's proffered expert testimony inappropriate for two reasons. First, Defendant is incorrect that Plaintiff lacks a causal link between the presence of soot and adverse effects from such soot. Mr. Irmiter's expert testimony addresses the presence of soot in the Properties and the need to remove the soot to return the Properties to pre-loss

15

condition. As discussed earlier, the adverse health effects of soot are not at issue in this case, although those effects likely underlie the building code and industry standards on which Mr. Irmiter relied in determining the required scope of repair.

Second, the Court finds Mr. Howarth's expert testimony will provide significant probative value and this probative value is not substantially outweighed by any risk of unfair prejudice or likelihood of confusing the jury. Unfair prejudice "refers to evidence which tends to suggest decision on an improper basis." *Bonds*, 12 F.3d at 567 (quoting *United States v. Schrock*, 855 F.2d 327, 333 (6th Cir. 1988)). Defendant fails to explain how Mr. Howarth's testimony could result in a decision on anything other than the merits. As to confusing the jury, Mr. Howarth's testimony will inform the jury of the necessary repairs and corresponding costs to the Properties, and the Court sees no potential for confusion.

The Court will therefore **DENY** Defendant's motion (Doc. 64) as to Mr. Howarth's proffered expert opinions on the scope of damage, appropriate remediation measures, and the cost of repairs to the Properties.

### IV. CONCLUSION

The Court will **DENY** Defendant's motion (Doc. 64) to exclude the expert opinions of Mr. Thomas Irmiter and Mr. Charles Howarth and **CANCEL** the hearing on August 11, 2021.

**AN APPROPRIATE ORDER WILL ENTER.**

/s/
**CURTIS L. COLLIER**
**UNITED STATES DISTRICT JUDGE**